# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs February 15, 2017

## STATE OF TENNESSEE v. JUAN DIEGO VARGAS

**Appeal from the Criminal Court for Davidson County**
**No. 2010-B-1410     Cheryl A. Blackburn, Judge**

_____

**No. M2015-02458-CCA-R3-CD – Filed February 21, 2017**

_____

Defendant, Juan Diego Vargas, was convicted by a Davidson County jury of first degree murder and sentenced to life imprisonment. On appeal, he challenges the sufficiency of the evidence. After a review, we affirm the judgment of the trial court. However, it appears that the trial court failed to enter a judgment form dismissing Count Three of the indictment. Accordingly, we remand for entry of a judgment form dismissing Count Three of the indictment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed and Remanded**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which THOMAS J. WOODALL, P.J., and ROBERT W. WEDEMEYER, J., joined.

Mark Kovach, Nashville, Tennessee, for the appellant, Juan Diego Vargas.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; Glenn R. Funk, District Attorney General; Doug Thurman and Lody Limbird, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

Defendant and his brother were indicted by the Davidson County Grand Jury in April of 2010 for first degree murder and employing a firearm during the commission of a dangerous felony.[1] The incident giving rise to the indictment occurred on March 1,

---

[1] Defendant's brother was indicted in Count Two as an accessory after the fact.

2010, inside Las Potrancas[2] Bar on Haywood Lane where Manual Santos Reyes, the victim, was shot. He died from a gunshot wound to the head several days later.

Ahmad El-Assuli, a licensed armed security guard, was employed by the owner of the bar, which was primarily patronized by Spanish-speaking customers. At the time of the incident he had worked there approximately eight months. His job required him to search the customers coming in for "[a]ny guns, any weapons" and to "maintain[] peace inside the bar and watch[] the customers." Mr. El-Assuli did not speak Spanish.

On the evening of Sunday, February 28, 2010, business was slow inside the small bar, which was located in a building that used to be a Waffle House. A few "regular" customers, including the victim and his friend, Antonio Hernandez, were inside the bar playing pool. The victim was dating one of the servers, Laura Cervantes.

Around 9:00 p.m., Mr. El-Assuli searched a man entering the bar. He did not recognize the man, who sat with several of his friends at a table in the back corner of the bar near the pool table. Mr. El-Assuli did not see any interaction between the men seated at the table and the victim during the evening.

Around 2:15 a.m., Mr. El-Assuli checked the bathroom to make sure it was empty because it was approaching closing time. When he exited the bathroom, he saw the man get up from his table in the far corner of the bar and walk toward the exit door. According to Mr. El-Assuli, the man stopped near the pool table and "looked like he said something" to the victim, possibly even whispering it to him. Mr. El-Assuli thought the interaction between the two men lasted anywhere from ten to thirty seconds. Then, the man pulled a gun from his waistband, pointed it to the victim's head, and pulled the trigger.

Mr. El-Assuli testified that he pulled out his gun, pointed it at the man and pulled the trigger before realizing that the safety was engaged. Mr. El-Assuli quickly put his gun back in the holster, "hoping" that the man did not see him because the man's "friends got all around him," trying to take him outside. The man "climb[ed] on top of [his friends]" and pointed his gun at Mr. El-Assuli and tried to shoot him three times, but "[o]ne of [the man's] friends pull[ed] him down."

The group left the bar. Mr. El-Assuli waited for about thirty seconds before going outside. He saw them get into a maroon Impala with temporary tags. He was unable to see who was driving but watched the car make a U-turn and drive slowly through the

---

[2] "Potranca" is the Spanish word for a filly or young mare less than three years of age. https://www.collinsdictionary.com/dictionary/spanish-english/potranca (last visited Jan. 26, 2017).

parking lot past the front of the bar. Mr. El-Assuli drew his pistol and fired a warning shot at the car, hoping to scare them and draw the attention of police. Mr. El-Assuli then called police and an ambulance. Once the men left, he went back inside the bar to help the victim, who was still alive.

Mr. El-Assuli's hunch regarding his warning shot was correct. Officer James Thomas was nearby investigating an abandoned vehicle and heard a gunshot coming from the direction of Las Potrancas. Officer Thomas arrived in time to see a dark-colored Impala pull out of the parking lot.

The victim was still alive when the ambulance arrived but later died as a result of a single gunshot wound to the head. Dr. Erin Carney, a forensic pathologist, testified the shot was fired from an "indeterminate range."

As part of the investigation, Mr. El-Assuli met with detectives from the Metropolitan Nashville Police Department. Mr. El-Assuli was shown several photographic lineups. In one, he identified the person who pulled down the shooter's arm. In another lineup, Mr. El-Assuli identified the shooter as the man "in the bottom row in the middle." Mr. El-Assuli explained that the photograph of the man he identified as the shooter was labeled "5" on the lineup but the lineup form he signed indicated that he identified photograph "6." Mr. El-Assuli explained that the officer "just got the wrong number [on the lineup form]" because both the man in photograph "5" and the man in photograph "6" had the first name "Juan." Mr. El-Assuli insisted that he picked out the person in position "5" on the lineup, the picture "in the bottom row in the middle," identified as Defendant. Detective Derry Baltimore confirmed that Mr. El-Assuli picked out Defendant's photograph, in position "5" on the lineup but that he made a mistake and improperly wrote "No. 6" on the lineup form that was later signed by Mr. El-Assuli. When asked, Mr. El-Assuli was unable to identify Defendant at trial.

Mr. Hernandez was playing pool with the victim the night of his death. There were not very many people at Las Potrancas that night, and he was not paying much attention to any of the men sitting at the table in the back corner of the bar. Mr. Hernandez saw the group get up to leave the bar and "saw that they just walked by the billiard table and they shot." It appeared as if the victim moved his head as if he were talking to someone before he was shot. However, Mr. Hernandez was unable to identify the shooter. Mr. Hernandez saw the men get into a car with temporary tags. He was unable to identify Defendant at trial.

Ms. Cervantes, a bartender at Las Potrancas, was the victim's girlfriend. Ms. Cervantes dated the victim for approximately two years prior to his death. The night of the shooting, the victim came to the bar around 7:00 p.m. when Ms. Cervantes reported

for work. He spent the night playing pool with Mr. Hernandez. When Ms. Cervantes heard the gunshot, she was in the midst of clearing empty beer bottles from the bar area. She immediately threw her body down to the ground behind the bar and was unable to see who shot the victim. When she got up from her hiding place, she saw a person leaving the bar with a gun in his hand. He was being followed by other people.

Ms. Cervantes met with police the day after the incident. She was able to identify Defendant's brother, Aldofo Vargas,[3] from a photographic lineup. She knew that he was Defendant's brother from conversation at the bar. In another photographic lineup, Ms. Cervantes identified Defendant stating that "he looks like [the person holding the pistol]." Ms. Cervantes did not see who fired the shot.

Debora Caferri was one of Defendant's close friends. She was "close to dating" Defendant for nine or ten months prior to the incident. Around 4:00 or 5:00 a.m. on March 1, 2010, she received a phone call from Defendant. During the conversation, Defendant told her that he was leaving town "because him and his brother, they had got in some trouble and that a man was being killed. So they had to leave the country right away." Defendant told her,

> [s]omething about that they were at Potrancas Bar and he was with his friends, and the guy was playing pool, and I guess there were some mean looks. The guy was looking at them the wrong way and they were just about to get in a fight . . . and that's when the shooting happened.

Ms. Caferri stated it was possible Defendant told her "we" shot somebody. Defendant called a few days later to tell her that he was in Missouri using a different name. She could not remember if he was going by the name "Pedro" or "Fernando."

Ms. Caferri was able to tell officers that Defendant lived with his brother and other relatives at an address in Nashville and that they drove a "dark red four-door" car. At trial, she explained that Defendant looked different at trial than he did in 2010 because he had gained weight, had longer hair, more facial hair, and his skin was lighter.

Police executed a search warrant at the residence where Defendant was living. They located an international driver's license belonging to Defendant. The driver's license photograph was used to prepare the photographic lineups used by police. Several days later, police found a maroon Chevy Impala parked in the backyard of the Vargas

---

[3] The indictment identifies Defendant's brother as Aldofo Vargas, Jr. Ms. Caferri referred to Defendant's brother as "Adolfo." For consistency and clarity, we will refer to Defendant's brother by the name in the indictment—Aldofo Vargas, Jr.

home. The car had temporary tags and contained a sales receipt showing that Defendant purchased the car.

Defendant was eventually apprehended in 2014. He testified at trial that he was drinking at Las Potrancas on the night of the shooting for about three or four hours with his brother and a friend. When they got up to leave, he "saw that somebody was shot." Defendant claimed that he was not close to the person when the shooting happened and did not know who shot the person. Defendant insisted that he was drunk and did not really understand what happened. He remembered getting to the car and that his brother drove him home that night. Defendant admitted that he called Ms. Caferri and told her about the "accident" and he "thought that [his] brother and the other guy they had shot somebody" but that he "wasn't sure about what had happened." Defendant told Ms. Caferri that he was going to work where he "was doing tile in bathrooms." Defendant continued to work for about three more days before he was "detained with a fake ID and . . . deported." Defendant went back to Mexico for four or five months before illegally returning to the United States.

Defendant denied having a gun at the bar or shooting the victim. He explained that someone fired the gun over his shoulder. He left the bar with the people who were sitting at his table. As they were leaving, his brother "hugged" him. He denied that his brother grabbed his arm. Defendant stipulated that as part of the investigation, police identified Defendant's latent fingerprints from a beer bottle collected from Las Potrancas Bar.

At the conclusion of the testimony, the jury found Defendant guilty of first degree murder. According to the judgment form entered by the trial court, Count 3 of the indictment, charging Defendant with employing a firearm during a dangerous felony, was dismissed. After the denial of a motion for new trial, Defendant filed a timely notice of appeal.

*Analysis*

On appeal, Defendant challenges the sufficiency of the evidence. Specifically, he insists that the faulty identifications, the indeterminate shooting range, and the statements attributed to Ms. Caferri all indicate that he is not the killer. The State disagrees.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal

to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003). As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

As applicable to this case, first degree murder is described as "[a] premeditated and intentional killing of another." T.C.A. § 39-13-202(a). Tennessee Code Annotated section 39-13-202(d) provides that:

> "[P]remeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

An intentional act requires that the person have the desire to engage in the conduct or cause the result. T.C.A. § 39-11-106(a)(18).

Whether the evidence was sufficient depends entirely on whether the State was able to establish beyond a reasonable doubt the element of premeditation. *See State v. Sims*, 45 S.W.3d 1, 7 (Tenn. 2001); *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999). Premeditation may be proved by circumstantial evidence. *See, e.g.*, *State v. Brown*, 836 S.W.2d 530, 541-42 (Tenn. 1992). Whether premeditation is present is a question of fact for the jury, and it may be inferred from the circumstances surrounding the killing. *State*

*v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006); *see also State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000); *State v. Pike*, 978 S.W.2d 904, 914 (Tenn. 1998). Our supreme court has identified a number of circumstances from which the jury may infer premeditation: (1) the use of a deadly weapon upon an unarmed victim; (2) the particular cruelty of the killing; (3) the defendant's threats or declarations of intent to kill; (4) the defendant's procurement of a weapon; (5) any preparations to conceal the crime undertaken before the crime is committed; (6) destruction or concealment of evidence of the killing; and (7) a defendant's calmness immediately after the killing. *Bland*, 958 S.W.2d at 660; *Jackson*, 173 S.W.3d at 409; *Nichols*, 24 S.W.3d at 302; *Pike*, 978 S.W.2d at 914-15. This list, however, is not exhaustive and serves only to demonstrate that premeditation may be established by any evidence from which the jury may infer that the killing was done "after the exercise of reflection and judgment." T.C.A. § 39-13-202(d); *see Pike*, 978 S.W.2d at 914-15; *Bland*, 958 S.W.2d at 660. One well-regarded treatise states that premeditation may be inferred from events that occur before and at the time of the killing:

> Three categories of evidence are important for [the] purpose [of inferring premeditation]: (1) facts about how and what the defendant did prior to the actual killing which show he was engaged in activity directed toward the killing, that is, planning activity; (2) facts about the defendant's prior relationship and conduct with the victim from which motive may be inferred; and (3) facts about the nature of the killing from which it may be inferred that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a preconceived design.

2 Wayne R. LaFave, *Substantive Criminal Law* § 14.7(a) (2d ed. 2003); *State v. Berry*, 141 S.W.3d 549, 566 (Tenn. 2004).

Without challenging the State's proof of any specific element, Defendant instead challenges the witnesses who identified him as the shooter. "The identity of the perpetrator is an essential element of any crime." *State v. Robert Wayne Pryor*, No. M2003-02981-CCA-R3-CD, 2005 WL 901140, at *3 (Tenn. Crim. App. Apr. 19, 2005) (citing *State v. Thompson*, 519 S.W.2d 789, 793 (Tenn. 1975)), *no perm. app. filed*. The State has the burden of proving "the identity of the defendant as the perpetrator beyond a reasonable doubt." *Id.* (citing *State v. Sneed*, 908 S.W.2d 408, 410 (Tenn. Crim. App. 1995)). The identity of the defendant as the perpetrator may be established by direct evidence, circumstantial evidence, or a combination of the two. *Thompson*, 519 S.W.2d at 793. "The credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made." *State v. Radley*, 29 S.W.3d 532, 537 (Tenn. Crim.

App. 1999) (citing *State v. Strickland*, 885 S.W.2d 85, 87-88 (Tenn. Crim. App. 1993)). The identification of the defendant as the perpetrator is a question of fact for the jury after considering all the relevant proof. *Strickland*, 885 S.W.2d at 87 (citing *State v. Crawford*, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982)).

Mr. El-Assuli testified that he did not recognize Defendant when he entered the bar on the night of the incident but that he was able to identify him in a photographic lineup after the event. Mr. El-Assuli explained the discrepancy in the lineup form and what he circled on the lineup itself as a mistake, insisting that he correctly identified Defendant in the lineup. Additionally, Ms. Cervantes identified both Defendant and his brother in a photographic lineup even though she was unable to identify him at trial. There was testimony at trial indicating that Defendant looked significantly different than he did in 2010 because he was heavier, had longer hair, and had lighter skin. Ms. Caferri testified that she received a call from Defendant on the night of the shooting during which he told her about the "shooting." Moreover, Defendant admitted that he was at the bar that night and his fingerprints were found on a beer bottle collected by police. Defendant denied that he was the shooter. The jury determined from all the relevant proof that Defendant was in fact the perpetrator. We will not disturb this finding.

As part of his challenge to the sufficiency of the evidence, Defendant also attacks the testimony provided by Dr. Erin Carney, the forensic pathologist who testified for the State. In her expert opinion, the fatal gunshot wound was fired from an indeterminate range. Dr. Carney explained that the "indeterminate range" finding was based on the fact that there was no "soot or gunpowder stippling" near the gunshot wound. She explained that "hair can filter out some of the soot and gun powder stippling" and that the victim had "a fair amount of hair around the entrance wound" which could explain why there is not stippling or soot in that area. Defendant argues that the "medical opinion contradicts Mr. El-Assuli's version of events [where he testified the victim was shot at close range] and is further evidence that Mr. El-Assuli did not accurately report the event that occurred" on the night the victim was shot. This challenge, in our view, is primarily to the weight to be given to the evidence and the credibility of the witnesses, questions that are resolved by the jury. *Pruett*, 788 S.W.2d at 561. The jury reviewed the evidence and found that Defendant was guilty of the murder of the victim.

Moreover, we find the forensic testimony rendered by Dr. Carney is consistent with the testimony of Mr. El-Assuli. The forensic testimony showed that the shot was fired from an indeterminate range—it did not explicitly eliminate the possibility that the shot was fired at close range.

*Conclusion*

Based upon the foregoing, Defendant's conviction for first degree murder is affirmed. The matter is remanded to the trial court for entry of a judgment form dismissing Count Three.

_____
TIMOTHY L. EASTER, JUDGE